UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARIO SENTELLE CAVIN,

               Plaintiff,               Case No. 2:21-cv-12535
                                        District Judge Gershwin A. Drain
v.                               Magistrate Judge Anthony P. Patti

HEIDI E. WASHINGTON, *et al.*,

               Defendants.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION TO DISMISS (ECF No. 22)

**I.**    **RECOMMENDATION**: The Court should **GRANT** the remaining

Defendants' motion to dismiss (ECF No. 22).

**II.**    **REPORT**

    **A.**    **Background**

    Mario Sentelle Cavin is a state prisoner currently incarcerated at the

Michigan Department of Corrections (MDOC) Macomb Correctional Facility

(MRF). (*See* www.michigan.gov/corrections, "Offender Search," last visited Jan.

24, 2023.) On October 20, 2021, Cavin filed the instant lawsuit, which concerns

the conditions of confinement at MRF as the COVID-19 pandemic began to make

its imprint on the world. (ECF No. 1, PageID.4-8 ¶¶ 16-36.) His verified

complaint names seven Defendants: (1) MDOC Director Heidi E. Washington; (2)

MDOC Deputy Director Kenneth McKee; (3) MRF Warden Willis Chapman; (4) MRF Deputy Warden George Stephenson; (5) MRF Assistant Deputy Warden Kristopher Steece; (6) MRF Corrections Officer Melanie Wright; and, (7) MRF Corrections Officer Unknown Jones, whose first name has since been identified as Pamela. (ECF No. 1, PageID.1, 3-4; *see also* ECF No. 20, PageID.78.)

On November 4, 2022, Defendants Washington and McKee were dismissed. (ECF No. 27, PageID.195 ¶ 6; ECF No. 29.) Accordingly, only MDOC Defendants Chapman, Stephenson, Steece, Wright, and Jones remain (collectively, "Defendants").

## B.    Instant Motion

Judge Drain has referred this case to me for pretrial matters. (ECF No. 23.) Currently before the Court is the Defendants' March 23, 2022 motion to dismiss and for summary judgment on the basis of exhaustion. (ECF No. 22.) Plaintiff timely filed a response on May 2, 2022 (ECF No. 25), and Defendants filed a reply on May 27, 2022 (ECF No. 26).[1]

---

[1] "If filed, a reply brief supporting such a motion must be filed within 14 days after service of the response, but not less than 3 days before the motion hearing." E.D. Mich. LR 7.1(e)(2)(B). In other words, any reply to the timely May 2, 2022 response (ECF No. 25) would ordinarily have been due on May 16, 2022. However, Plaintiff's response, although post-marked May 2, 2022, was not docketed until May 13, 2022. Accordingly, Defendants' May 27, 2022 reply (ECF No. 26) is timely.

**C.    Discussion**

   **1.    Plaintiff's claims arise from alleged conditions of confinement at MRF during the COVID-19 pandemic.**

Plaintiff is a "severe asthmatic."  (ECF No. 1, ¶ 1.)  While he acknowledges that coronavirus vaccines were not available at the beginning of the pandemic, he contends the Center for Disease Control and Preventions' (CDC's) "recommended preventative measures to decrease transmission of COVID-19" included "aggressive social distancing" and "heightened attention to hygiene and disinfection . . . [,]" which he claims are "impossible with double-bunking and watered-down disinfectants."  (ECF No. 1, ¶ 16.)  Plaintiff alleges he is "left exceptionally exposed to a deadly virus[,]" which is "particularly concerning for medically vulnerable prisoners . . . ."  (ECF No. 1, ¶ 17.)

   **a.    MRF's Housing Unit 2 and Michigan's March 2020 State of Emergency**

Plaintiff alleges that throughout February 2020, MRF Housing Unit 2 prisoners "were allowed to co-mingle on the big yard . . . [,]" and "were permitted to congregate [beyond capacity] in the small dayrooms . . . ."  (*Id*., ¶ 18.)  Towards "the end of February and into early March of 2020," prisoners within Unit 2 "began suffering from headaches, cold sweats, fevers, diarrhea and breathing problems."  (*Id*., ¶ 19.)  According to Plaintiff, he would wrap a t-shirt "around his face to avoid accidental exposure[,]" but unit officers told him "he could not wear

3

such items." (*Id.*, ¶ 20; *see also id.*, PageID.27 ¶ 5.)  While he alleges that nursing staff came to Unit 2 on a daily basis "to provide vitamins to certain 'at risk' prisoners[,]" Plaintiff also alleges that, when he "asked was anything being done to prevent the spread of COVID [throughout] MRF[,]" at least three nurses told him that "'COVID-19 hasn't reached Michigan yet,'" and "'these prisoners only have flu symptoms.'" (*Id.*, ¶ 21; *see also id.*, PageID.26 ¶ 2.)

On March 10, 2020, Governor Gretchen Whitmer, the Michigan Department of Health and Human Services (MDHHS), the Oakland County Health Division, and the Wayne County Health Department announced that "two Michigan residents tested presumptive positive for coronavirus disease 2019 (COVID-19), the first confirmed cases in the state."[2]  That same day, Governor Whitmer declared a state of emergency.  (*See* EO 2020-04, EO 2020-05.)  Plaintiff alleges that, on March 13, 2020, Macomb County Executive Mark Hackel "declared a State of Emergency to deal with COVID-19." (*Id.*, ¶ 22.)  A few days later, on March 16, 2020, Governor Whitmer issued several executive orders, including one concerning temporary restrictions on the use of places of public accommodation (EO 2020-09) and another concerning temporary prohibition on large assemblages

---

[2] (*See* https://www.michigan.gov/coronavirus/News/2020/03/10/michigan-announces-first-presumptive-positive-cases-of-covid-19-governor-whitmer-declares-a-state-o.)

and events, as well as temporary school closures (EO 2020-11).  (*See also id*., ¶ 24.)

Plaintiff describes the conditions of confinement at MRF, such as the inability to adequately socially distance, denial or delay of medical treatment, inadequate access to soap, inadequate cleaning supplies, not having access to necessary hygiene services, and prisoners being "shuffled from housing unit to housing unit with no regard for which people are symptomatic and which are not." (*Id*., ¶ 27.)  Plaintiff allegedly "observed multiple prisoners showing COVID symptoms but refus[ing] to report it[,] because of the conditions faced while quarantined."  (*Id*., ¶ 28.)  According to Plaintiff, "[t]hese prisoners continued mingling with others and taking very few safety precautions."  (*Id*.)  Plaintiff further contends that, "[a]lthough minimal cleaning supplies were being provided in Housing Unit 2," and while "porters were assigned to sanitize common areas," the bleach and/or disinfectant "were so watered-down to be rendered ineffective." (ECF No. 1, ¶ 29.)  As Plaintiff puts it, "the MDOC's response did not include a single phase that allowed for meaningful social distancing."  (ECF No. 1, ¶ 30.)

Plaintiff attests that, at some point in March 2020, MRF began "cancelling group gatherings," "implementing social distancing protocols," and "hir[ing] more porters to clean common areas[,]" yet, the policies and procedures "were only marginally being enforced . . . especially in Unit-2."  (ECF No. 1, PageID.26 ¶ 3.)

Plaintiff also attests that, although "[c]leaning supplies were brought in . . . [,]" they "were not readily available to prisoners."  (*Id*.)  (*See also* ECF No. 25, PageID.169.)  He further attests that, despite "the removal of tables and chairs in the dayrooms," prisoners still "gathered to play cards or watch sports[,]" and "congregated in hallways and bathrooms when not allowed in the dayrooms." (ECF No. 1, PageID.26-27 ¶ 4.)  According to Plaintiff, "[l]arge groups went to the big yard and returned in large groups."  (*Id*.)  (*See also* ECF No. 25, PageID.169.)

Moreover, Plaintiff believes "masks were not provided until March 28, 2020 to be worn by all staff and prisoners."  (ECF No. 1, ¶ 31.)  He attests that, even after mask mandates, "numerous officers and prisoners refused to wear them unless specifically ordered to do so."  (ECF No. 1, PageID.27 ¶ 5.)

### b.    Positive COVID-19 test and transfer to Housing Unit 5's COVID wing

On or about March 25, 2020, Plaintiff "began feeling symptoms of COVID-19," but "wasn't tested (or quarantined) until days later when he was placed in segregation and later transferred to Housing Unit 5's COVID wing where he remained for nearly two months."  (*Id*., ¶ 31; *see also id*., PageID.27 ¶ 7.)  On April 5, 2020, Plaintiff tested positive for COVID-19.  (ECF No. 1, ¶ 1.)

Pointing to the Eighth Amendment's requirement that "inmates be furnished with the basic human needs, one of which is 'reasonable safety[,]'" *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (quoting *DeShaney v. Winnebago Cnty. Dep't of*

*Soc. Servs.*, 489 U.S. 189, 200 (1989)), Plaintiff alleges that he "faced an imminent risk of serious injury or death once contracting COVID." (ECF No. 1, ¶ 32.) He alleges that, after being placed in Housing Unit 5, he . . .

> . . . was forced to share a cell with another prisoner who tested positive for COVID – which [Plaintiff] contends is the reason he himself continued testing positive far past the expected two week period. This other prisoner continued sneezing and coughing without covering his nose or mouth, and never took any precautions to prevent further contamination.

(*Id.*, ¶ 33.)

### c.   Prison-Related Executive and Emergency Orders

From March 29, 2020 to September 30, 2020, Governor Whitmer issued several executive orders concerning "temporary recommended COVID-19 protocols and enhanced early-release authorization." (*See* EOs 2020-29, 2020-62, 2020-119, 2020-146, 2020-170, and 2020-189.) Meanwhile, on August 19, 2020, the MDHHS issued an emergency order regarding mandatory testing for prison staff, although the MDOC had until September 8, 2020 to begin weekly testing. (ECF No. 1, ¶ 35.) The MDHHS's similarly titled February 10, 2021 emergency order, provided, *inter alia*:

> Upon notification by MDHHS that an outbreak at a prison is an outbreak of special concern, the Michigan Department of Corrections ("MDOC") must adopt testing and infection control procedures provided by MDHHS until directed otherwise by MDHHS.

Several months later, on June 25, 2021, the MDHHS issued an emergency order setting forth "requirements for prisons," which included provisions for "testing of staff members and inmates" and "transmission prevention protocols."  (*See* https://www.michigan.gov/coronavirus/resources/orders-and-directives/lists/executive-directives-content/rescinded-mdhhs-epidemic-orders.)[3]

Plaintiff believes that "weekly testing did nothing to prevent the introduction or spread of COVID within MRF."  (*Id*.)  In the end, he alleges that, "*all defendants* from February 2020 until June 2021:

> . . . continued double-bunking COVID positive prisoners with other COVID positive prisoners, and prisoners being quarantined for close contact were crammed into cells with one another prior to determining if either ha[d] tested positive.  Asymptomatic staff were still being permitted to enter the facility and reinfect the population over and over.

(*Id*., ¶ 36 (emphasis added).)

### 2. Whether Plaintiff has stated an Eighth Amendment claim against Chapman, Stephenson, Steece, Jones, or Wright?

#### a. Fed. R. Civ. P. 12(b)(6)

---

[3] The June 25, 2021 order has since been rescinded by way of MDHHS's January 13, 2022 emergency order, which also contains provisions for "testing of staff members and inmates" and "transmission prevention protocols."  (*See* https://www.michigan.gov/coronavirus/resources/orders-and-directives/lists/executive-directives-content/january-13-2022-requirements-for-prisons.)

Defendants argue that Plaintiff fails to state an Eighth Amendment claim against Chapman, Stephenson, or Steece.  (ECF No. 22, PageID.93-105.)  When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "construe the complaint in the light most favorable to plaintiff and accept all allegations as true."  *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (concluding that a plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action").

Furthermore, the Court holds pro se complaints to "less stringent standards than formal pleadings drafted by lawyers."  *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  However, even in pleadings drafted by pro se parties, "'courts should not have to guess at the nature of the claim asserted.'"  *Frengler v. Gen. Motors*, 482 F. App'x 975, 976-77 (6th Cir. 2012) (quoting *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989)).  Moreover, "courts may not rewrite a complaint to include claims that were never presented . . . nor may courts construct the Plaintiff's legal arguments for him.  Neither may the Court 'conjure up unpled allegations[.]'"

9

*Rogers v. Detroit Police Dept.*, 595 F.Supp.2d 757, 766 (E.D. Mich. 2009)

(Ludington, J., *adopting report and recommendation of* Binder, M.J.).

### b.    Eighth Amendment

Plaintiff sweepingly alleges that "defendants individually and collectively failed to protect and/or implement comprehensive safeguards, protocols, procedures and/or measures to protect [him] – a severe asthmatic – from coming into contact and being infected with COVID-19[,]" even after "being given guidance" from various governmental sources.  (ECF No. 1, ¶ 1.)  He claims this was deliberately indifferent to his health and "result[ed] in Cavin testing positive for COVID-19 on April 5, 2020[.]"  (*Id.*)  He further claims this deliberate indifference "resulted in him suffering asthma attacks, chest pains, diarrhea, coughing up blood, dizziness, loss of smell and taste, loss of weight, headaches, lack of appetite as well as long-term breathing problems and psychological, mental distress and other pecuniary losses not yet ascertained."  (*Id.*, ¶ 3.)

Plaintiff's claims are based on the Eighth Amendment.  (ECF No. 1, ¶¶ 1, 2, 25, 38.)  "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are

10

subject to scrutiny under the Eighth Amendment[.]" *Farmer*, 511 U.S. at 832

(internal and external quotations and citations omitted).

### c.   Objective

"The Eighth Amendment's deliberate indifference framework includes both

an objective and subjective prong." *Wilson v. Williams*, 961 F.3d 829, 839 (6th

Cir. 2020) (citing *Farmer*, 511 U.S. at 834 (1994)).  "In assessing the objective

prong, we ask whether petitioners have provided evidence that they are

'incarcerated under conditions posing a substantial risk of serious harm.'" *Wilson*,

961 F.3d at 840 (quoting *Farmer*, 511 U.S. at 834).  The Sixth Circuit has

addressed this question in a correctional facility environment where inmates sought

"to obtain release from custody to limit their exposure to the COVID-19 virus[,]"

*Wilson*, 961 F.3d at 832-833, as follows:

> The COVID-19 virus creates a substantial risk of serious harm leading
> to pneumonia, respiratory failure, or death. The BOP acknowledges
> that "[t]he health risks posed by COIVD-19 [sic] are significant."
> CA6 R. 35, Appellant Br., PageID 42. The infection and fatality rates
> at Elkton have borne out the serious risk of COVID-19, despite the
> BOP's efforts. The transmissibility of the COVID-19 virus in
> conjunction with Elkton's dormitory-style housing—which places
> inmates within feet of each other—and the medically-vulnerable
> subclass's health risks, presents a substantial risk that petitioners at
> Elkton will be infected with COVID-19 and have serious health
> effects as a result, including, and up to, death.

*Wilson*, 961 F.3d at 840.  As Defendants admit "[r]egarding the dangers posed by

COVID-19," (ECF No. 22, PageID.99), "the objective prong is easily satisfied."

11

*Wilson*, 961 F.3d at 840.  Thus, Defendants agree with Plaintiff that "COVID-19 satisfies the objective prong of the Eighth Amendment[,]" because Plaintiff "was incarcerated under conditions posing a substantial risk of serious harm."  (ECF No. 25, PageID.167.)

### d.   Subjective

Defendants focus on the subjective prong, where "the question is whether petitioners have demonstrated that the [MDOC]'s response to the COVID-19 pandemic has been deliberately indifferent to th[e] serious risk of harm."  *Wilson*, 961 F.3d at 840.  (*See* ECF No. 22, PageID.99-105; ECF No. 26, PageID.190-191.) As the Sixth Circuit explains:

> Under the subjective prong, an official must know[] of and disregard[] an excessive risk to inmate health or safety.  [I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.  It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk. [P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.

*Wilson*, 961 F.3d at 840 (internal quotations and citations to *Farmer v. Brennan*, 511 U.S. 825, 836, 837, 842, 844 (1994) omitted).

Having reviewed Plaintiff's pleading, his factual and claims fall into four categories.

12

   **i.**  **Allegations or claims not tied to a specified party (ECF No. 1, ¶¶ 17-22, 24, 26-33, 35, 37)**

  Plaintiff's complaint contains several allegations or claims that do not mention a party. Without using the words "defendant" or "defendants," Plaintiff takes issue with the conditions of confinement at MRF, such as the inability to adequately socially distance, denial or delay of medical treatment, inadequate access to soap, inadequate cleaning supplies, or not having access to necessary hygiene services. (ECF No. 1, ¶¶ 17, 27.) He describes MRF Housing Unit 2 in February 2020 and March 2020. (*Id.*, ¶¶ 18-21, 28-30.) He also describes his March 25, 2020 onset of COVID-19 symptoms, testing (or quarantining) days later, and transfer to MRF Housing Unit 5's COVID wing, where he allegedly "remained for nearly two months." (ECF No. 1, ¶ 31.) He believes masks were not provided until March 28, 2020. (*Id.*) He claims to have "faced an imminent risk of serious injury or death once contracting COVID[,]" and describes the conditions of confinement in Unit 5. (*Id.*, ¶¶ 32-33.) And, he questions the utility of weekly testing. (*Id.*, ¶ 35.) (*See also id.*, ¶¶ 22, 24, 26, 37.)

  As to these claims not tied to specified defendants, the movants are entitled to dismissal for at least two reasons. First, Plaintiff's allegations that do not name a party fail to allege who is at fault. Thus, these allegations do not provide "a short and plain statement of the claim showing that the pleader is entitled to relief" from a specific Defendant. *See* Fed. R. Civ. P. 8(a)(2). The goal of the complaint is to

"'give the defendant fair notice of what the . . . claim is and the grounds upon

which it rests.'"  *Bell Atlantic Corp.*, 550 U.S. at 555 (quoting *Conley* v. *Gibson*,

355 U.S. 41, 47 (1957)).  Here, none of the named defendants is put on notice of

the need to defend against these claims.  Second, the movants convincingly argue –

at least as applied to the allegations made against unspecified defendants – that

Plaintiff "cannot establish the subject[ive] prong of an Eighth Amendment

claim[,]" because "the MDOC has taken significant measures to limit the threat

posed by COVID-19[,]" including matters related to "Personal Protective

Equipment, cleaning and mitigation measures" and "Quarantine and Care of Sick

Prisoners[,]" *Robinson v. Huss*, No. 2:21-CV-71, 2021 WL 1884541, at *6 (W.D.

Mich. May 11, 2021) (footnote omitted).[4]  (ECF No. 22, PageID.99-102.)  *See also*

*Hinton v. Skipper*, No. 1:21-CV-480, 2021 WL 4859744, at *4 (W.D. Mich. Oct.

19, 2021) (same).  As Judge Maloney penned:  "Clearly, the MDOC has taken

extensive steps to address the risk of COVID-19 to inmates statewide.  As noted by

the Sixth Circuit in *Wilson*, such actions demonstrate the opposite of a disregard of

a serious health risk."  *Robinson*, 2021 WL 1884541, at *10 (citing *Wilson*, 961

---

[4] Judge Maloney took judicial notice of these measures, as then set forth in
"MDOC Response and Information on coronavirus (COVID-19),"
https://medium.com/@Michigan DOC/mdoc-takes-steps-to-prevent-spread-of-
coronavirus-covid-19-250f43144337 (updated Apr. 20, 2022); "MDOC Response
and Information on COVID-19," https://www.michigan.gov/corrections/covid-19
(updated Jan. 18, 2023).

F.3d at 841).  (*See* ECF No. 11, PageID.102-103.)  In sum, the free-standing allegations that are not specifically tied to them do not state a claim against Chapman, Stephenson, Steece, Jones, and/or Wright upon which relief may be granted.

> ### ii.     Allegations or claims against collective or non-specific Defendants (ECF No. 1, ¶¶ 16, 36, 38, 39)

In several places, Plaintiff pleads in the collective, such as by referencing "all defendants" or "defendants" without further modification (*see*, *e.g.*, *id*., ¶¶ 16, 36, 39).  For example, several paragraphs taking issue with a failure to protect, to act, and/or "implement comprehensive safeguards, protocols, procedures and/or measures . . . " do not name a specific Defendant (ECF No. 1, ¶¶ 1, 3, 38).  Indeed, Plaintiff's two references to "defendant's" may well have been intended as plural, rather than singular, possessives (*see id*., ¶¶ 3, 38), and the reference to "each defendant . . . knowingly caused Cavin to be deprived of his Constitutional rights" (*id*., ¶ 4) is equally general and non-specific.

Although "using collective references is not an impermissible pleading form *per se*[,]" *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1162 (S.D. Fla. 2019), on the issue of individual involvement, "it is insufficient to make generic or blanket allegations pertaining to 'defendants' or allegations lumping together individual defendants[,]" and "mere citation to each individual defendant's

job description—without an accompanying allegation showing how each defendant failed to comply with his or her job description—is insufficient." *Rouse v. Washington*, No. 20-CV-11409, 2021 WL 2434196, at *8 (E.D. Mich. June 15, 2021) (Goldsmith, J.). *Compare Kesterson v. Moritsugu*, No. 96-5898, 1998 WL 321008, at *7 (6th Cir. June 3, 1998) ("although he subsequently references the defendants collectively, construing his pro se complaint liberally as the case law requires, reading the substance of each allegation in connection with a reference to ¶¶ 6-10[,]" where Plaintiff "describes who each defendant is and why he is suing that defendant[,]" provides each defendant with "notice of his alleged wrongdoing sufficient to satisfy Rule 8(a)(2)."). In this matter, Plaintiff's use of "defendants" in the collective or without modification (*see* ECF No. 1, ¶¶ 16, 36, 38, 39) does not provide Chapman, Stephenson, Steece, Jones, and/or Wright with sufficient "notice of his [or her] alleged wrongdoing" and, thus, these particular allegations – alone – do not state a claim against them upon which relief may be granted.

### iii.   Allegations against Chapman, Stephenson, and Steece (ECF No. 1, ¶¶ 23, 25)

Plaintiff identifies Chapman, Stephenson, and Steece respectively as the MRF Warden, the MRF Deputy Warden, and the MRF Assistant Deputy Warden. (ECF No. 1, ¶¶ 11-13.) Plaintiff's claims against these Defendants relate to two letters. First, by a letter dated March 15, 2020, Plaintiff wrote to Chapman,

Stephenson, and Steece about "[p]rotection from COVID-19 . . . [,]" mentioning he

is "a high-risk prisoner" because he has "severe asthma, so COVID could likely

kill me."  (ECF No. 1, PageID.12.)  Plaintiff alleges he did not receive a response.

(*Id.*, ¶ 23.)  Second, on or about March 18, 2020, while in Housing Unit 2, Plaintiff

wrote to, among others, Chapman, Stephenson, and Steece about "[l]ack of

adequate protection from COVID-19[,]" stating, *inter alia*:

> As an asthmatic, I am highly susceptible to COVID and fear I will be
> exposed by someone who is reckless with their own life.  Because
> there are numerous sick prisoners locking with healthy ones, I am
> asking to be placed in a single cell or transferred to a facility better
> equipped to minimize my risk of exposure.

(ECF No. 1, PageID.14.)  Plaintiff's letter expressly claims the request is made

pursuant to MDOC PD 03.03.130(I)(2), the present version of which provides:  "A

prisoner shall be placed in a single occupancy cell when necessary to ensure the

safety of the prisoner or others."  (*Id.*; MDOC PD 03.03.130, effective Apr. 1,

2022.)  Plaintiff alleges he did not receive a response.  (*Id.*, ¶ 25; *see also id.*,

PageID.27 ¶ 6.)

Plaintiff's claims against Chapman, Stephenson, and Steece must fail to the

extent they are based on either their roles as the warden, deputy warden, or

assistant deputy warden or their alleged failure to respond to the March 15th and

March 18th letters.  In his response, Plaintiff argues that Defendants ignored his

request(s) (ECF No. 25, PageID.169), but "[l]iability under § 1983 must be based

on active unconstitutional behavior and cannot be based upon 'a mere failure to

act.'" *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Salehpour v.*

*University of Tennessee*, 159 F.3d 199, 206 (6th Cir.1998), cert. denied (1999).

*See also Riss v. City of New York*, 22 N.Y.2d 579,  240 N.E.2d 860 (1968)

(explaining the difference between a misfeasance as opposed to a nonfeasance by

governmental actors).  Furthermore, section 1983 liability "must be based on more

than respondeat superior, or the right to control employees." *Id*.  Thus, as

Defendants point out:

> . . . a supervisory official's failure to supervise, control or train the
> offending individual is not actionable unless the supervisor "either
> encouraged the specific incident of misconduct or in some other way
> directly participated in it.  At a minimum a plaintiff must show that
> the official at least implicitly authorized, approved, or knowingly
> acquiesced in the unconstitutional conduct of the offending officers."
>
> *Id.* (quoting *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir.

1982)).  (ECF No. 22, PageID.94-95.)[5]

In the event Plaintiff intended a more direct claim against Chapman,

Stephenson, or Steece – *i.e.*, not one based on failure to respond to the letters or

---

[5] To the extent, if at all, Plaintiff's claims against Defendants Chapman,
Stephenson, and/or Steece were based simply on the denial of an administrative
grievance – such as MRF-20-05-0788-27z (which mentioned Chapman and
Stephenson, among others, and as to which Steece and Stephenson signed the Step
I and Step II responses) (*see ECF No. 22,* PageID.148-152), such claims would
similarly fail under Section 1983.  *Shehee*, 199 F.3d 295, 300 (6th Cir. 1999).

*respondeat superior* – Plaintiff makes two specific allegations against them, quoted

verbatim below:

- On or around March 15, 2020, Cavin submitted multiple kites to Defendants Chapman, Stephenson and Steece asking what comprehensive safety measures were being implemented to prevent the spread of COVID at MRF in light of the warnings provided by the World Health Organization on January 30, 2020, Gov. Whitmer's State of Emergency declaration on March 10, 2020, and Mark Hackel's State of Emergency declared on March 13, 2020.  . . . No response was provided.

- That day [March 18, 2020], Cavin sent additional kites to Defendants Washington, McKee, Chapman, Stephenson, and Steece based on their deliberate indifference to Cavin's health by failing to enforce *social distancing* requirements or issue each prisoner a *single-person cell* that would permit him to be at least six (6) feet apart from other potentially infected prisoners in accordance with Policy Directive 03.03.130(I)(2) . . . [.]  Cavin explained that sick and infected prisoners were bunking with healthy prisoners, causing further spread of COVID, and that as a chronic care prisoner, asked to be placed in a more protective environment.  . . . No response was provided.

(ECF No. 1, ¶¶ 23, 25 (emphases added); *id*., PageID.12, 14.)

In support of Plaintiff's argument that he has established "deliberate

indifference against each defendant" and "the subjective prong of the Eighth

Amendment . . . [,]" he notes that "[w]hether a prison official had the requisite

knowledge of a substantial risk is a question of fact subject to demonstration in the

usual ways, including inference from circumstantial evidence, . . . and a factfinder

may conclude that a prison official knew of a substantial risk from the very fact

that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)

(vacating court of appeal's summary affirmance of district court's grant of

summary judgment) (internal and external citations omitted).  (ECF No. 25,

PageID.167-168.)  Among other things, Plaintiff addresses the single occupancy

cell, enforcement and implementation of guidelines and mandates (such as those

related to social distancing), and notice imparted on Defendants (such as by

MDOC Policy or Plaintiff's letters).  (ECF No. 25, PageID.167-170.)

As to the single occupancy cell, Plaintiff contends he sent his March 18,

2020 letter to Chapman, Stephenson, and Steece "pleading to be placed in a single

cell or transferred to a place that could properly protect his health" pursuant to

MDOC 03.03.130(I)(2) and on the heels of Governor Whitmer's Executive Order

regarding, *inter alia*, crowds and social distancing, but his request "went ignored."

(ECF No. 25, PageID.167-168.)

As to enforcement and implementation of guidelines and mandates, Plaintiff

argues that Defendants "refused to ensure the CDC guidelines were being enforced

in each housing unit."  (ECF No. 25, PageID.168.)  Acknowledging Defendants'

reliance upon the MDOC measures outlined in *Robinson*, 2021 WL 1884541, at

*6-*8 (ECF No. 22, PageID.99-102), Plaintiff claims the guidelines "were

meaningless in the way they were implemented."  (ECF No. 25, PageID.168.)  For

example, if the CDC guidelines provide that social distancing is "a cornerstone of

reducing transmission of respiratory disease," the MDOC's COVID-19 response

"did not include a single phase that allowed for <u>meaningful</u> social distancing," such

as "living arrangements for vulnerable prisoners." (ECF No. 25, PageID.168

(emphasis in original); *see also* ECF No. 1, ¶ 30.) According to Plaintiff, "[m]ask

mandates were marginally being enforced." (ECF No. 25, PageID.169; *see also*

ECF No. 1, PageID.27 ¶ 5.)

Plaintiff also addresses the issue of notice. In his opinion, the existence of

MDOC PD 03.03.130 ("Humane Treatment and Living Conditions for Prisoners")

"indicates that Defendants were on notice of their duties long before any Executive

Orders or CDC Guidelines were mandated," and "their refusal to comply with their

own policy shows culpable state of mind." (ECF No. 25, PageID.168 n.1.)

Presumably referring to one or both of his letters, Plaintiff suggests he notified

Chapman, Stephenson, and Steece that he "required their assistance in protecting

his health." (ECF No. 25, PageID.169.) Plaintiff also contends that he informed

Steece, Stephenson, and Chapman that "Housing Unit 2 was not enforcing the

guidelines implemented by the CDC or the MDOC." (*Id*.)

Plaintiff argues that "[e]ach Defendant had the authority, ability, and duty to

ensure the [s]afety of Cavin's health and deliberately chose not to do so." (*Id*.)

Yet, having reviewed Plaintiff's arguments in response – including Plaintiff's

reliance on the Supreme Court's "great difficulty agreeing" with the proposition

that "prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year[,]" *Helling*, 509 U.S. at 33 – and even acknowledging the fact that Plaintiff tested positive on April 5, 2020, it remains that, *at the time of his March 18, 2020 letter*, testing positive for coronavirus was speculative.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (no standing where a plaintiff "relies on a highly attenuated chain of possibilities," and "does not satisfy the requirement that threatened injury must be certainly impending.").

More to the point, Plaintiff's specific allegations against Chapman, Stephenson, and Steece (ECF No. 1, ¶¶ 23, 25), which concern his March 15, 2020 or March 18, 2020 letters (*id*., PageID.12, 14), do not allege a sufficiently culpable state of mind.  *See Dykes-Bey v. Washington*, No. 21-1260, 2021 WL 7540173, at *3 (6th Cir. Oct. 14, 2021) (Plaintiff's "complaint does not allege, for example, that KCF [Kinross Correctional Facility] had enough physical space to implement social distancing, and that the defendants deliberately chose not to use that space.") (footnote omitted); *Winburn v. Nagy*, No. 2:20-CV-11145, 2021 WL 5822097, at *5 (E.D. Mich. Nov. 19, 2021) (Patti, M.J.) (allegations that Defendants "opened a COVID-19 unit at JCF and use one HUM – allegedly without protective gear – to serve both healthy and infected prisoners in an effort to save money, do not

22

describe their individual acts or involvement."), *report and recommendation adopted*, No. 20-CV-11145, 2021 WL 5798032 (E.D. Mich. Dec. 7, 2021) (Goldsmith, J.); and, *Crawford v. Washington*, No. 4:17-CV-11423, 2017 WL 8810687, at *8 (E.D. Mich. Nov. 7, 2017) (Patti, M.J.) ("Plaintiff has not alleged that Defendant Washington made a deliberate choice to follow a course of inaction from among various alternatives, and was correspondingly indifferent to the rights of HCV [hepatitis C virus] patients in the MDOC.") (internal quotations omitted), *report and recommendation adopted*, No. CV 17-11423, 2018 WL 747706 (E.D. Mich. Feb. 7, 2018) (Parker, J.).  (ECF No. 22, PageID.103-104.)  Contrary to Plaintiff's suggestion, he has not alleged that Chapman, Stephenson, or Steece "knowingly acquiesce[ed] in the unconstitutional conduct."  (ECF No. 25, PageID.167.)[6]

> **iv.   Allegations against Wright and Jones (ECF No. 1, ¶ 34) should be dismissed pursuant to this Court's screening function**

Plaintiff identifies Wright and Jones as MRF Corrections Officers and specifically alleges:  "While housed on the COVID wing, Cavin was only provided

---

[6] Attached to Plaintiff's response (ECF No. 25) are several affidavits, three of which are verified declarations from other prisoners (*id*., PageID.173, 175-176, 178-179), which Plaintiff offers to "demonstrate" the subjective component as to Stephenson, Chapman, and/or Steece (*id*., PageID.169).  They have not been considered in this report on Defendants' motion to dismiss, because "going beyond the pleadings and engaging in fact finding . . . is impermissible at the FRCP 12(b)(6) stage."  *Perry v. McGinnis*, 209 F.3d 597, 607 (6th Cir. 2000).

cell cleaning materials once or twice.  He continually asked Defendants Wright and Jones for cleaning supplies[,] because they were the regular unit officers, and he was told[,] 'ask the next shift.'"  (*Id*., ¶¶ 14-15, 34; *see also* ECF No. 1, PageID.27 ¶ 8.)

Although Defendants acknowledge this allegation in their statement of facts (ECF No. 22, PageID.90), and although the MDOC Defendants assert the "MDOC's actions in response to the COVID-19 pandemic demonstrate that these *five* individuals did not disregard a serious health risk[,]" (*id*., PageID.104-105 (emphasis added)), the MDOC Defendants do not substantively move for dismissal of these claims under Fed. R. Civ. P. 12; instead, they only argue that Plaintiff has not exhausted his claims against them (*id*., PageID.111).

Nonetheless, because Plaintiff was permitted to proceed without prepayment of the filing fee (ECF Nos.  2, 4), and because Plaintiff is "a prisoner [who] seeks redress from a governmental entity or officer or employee of a governmental entity[,]" the Court should consider *sua sponte* whether Plaintiff's claims against Wright and Jones "fail[] to state a claim upon which relief can be granted[,]" Fed. R. Civ. P. 12(b)(6).  *See* 28 U.S.C. § 1915 ("Proceedings in forma pauperis"), Subsection (e)(2)(B)(ii); 28 U.S.C. 1915A ("Screening"), Subsection (b)(1).

To be sure, *Wilson* and other cases have addressed provision of and access to cleaners and disinfectants.  *See, e.g., Wilson*, 961 F.3d at 841-844; *Cameron v.*

24

*Bouchard*, 815 F. App'x 978, 985-986 (6th Cir. 2020); and, *Valentine v. Collier*, 956 F.3d 797, 801-802 (5th Cir. 2020).  However, where Plaintiff contends that prisoners "do not have adequate access to soap," or "share multiple common areas without adequate supplies to clean them[,]" or "do not have access to necessary hygiene services to avoid infection[,]" (ECF No. 1, ¶ 27), this allegation, as noted above, is "not tied to a specific party."

Still, looking to the above-quoted paragraph that expressly mentions Wright and Jones, Plaintiff first states that, "[w]hile housed on the COVID wing, [he] was only provided cell cleaning materials once or twice[,]" (ECF No. 1, ¶ 34).  This allegation is addressed by the *MDOC's* "significant measures to limit the threat posed by COVID-19[,]" included increased production of soap, plentiful access to soap, and distribution of soap.  *Robinson*, 2021 WL 1884541, at *6-*7 (W.D. Mich. May 11, 2021).  More to the point, where Plaintiff express alleges that, while housed on the COVID wing, Plaintiff asked *Wright and Jones* on multiple occasions for cleaning supplies but was told to "ask the next shift" (ECF No. 1, ¶ 34), Plaintiff simply does not allege a sufficiently culpable state of mind.

### E.    Conclusion

If the Court agrees that Chapman, Stephenson, Steece, Wright, and Jones are entitled to dismissal of Plaintiff's claims against them, then the Court need not address either Defendants' summary judgment exhaustion argument (ECF No. 22,

PageID.105-112; ECF No. 26, PageID.191-192) or Plaintiff's related response

(ECF No. 25, PageID.170-171). In sum, in conjunction with exercising its

prerogative to screen IFP complaints, the Court should **GRANT** Defendants'

motion to dismiss (ECF No. 22), which will have the effect of closing this case.

## III. PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

72.1(d). Failure to file specific objections constitutes a waiver of any further right

of appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991). Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation. *Willis v. Sec'y of Health &*

*Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," *etc*. Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains. Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

26

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," *etc*.  If the Court determines that any objections are without

merit, it may rule without awaiting the response.


Dated: February 2, 2023

Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE